UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN MOE MOORE,<br><br>    Plaintiff,<br><br>v.<br><br>DR. MELISSA STOLSIG, et al.,<br><br>    Defendants. | Case No. 21-cv-01019-EJD (PR)<br><br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 43 |

    Plaintiff, a state prisoner proceeding *pro se*, filed this civil rights action pursuant to 42 U.S.C. § 1983 against prison officials at the Salinas Valley State Prison ("SVSP"). Dkt. No. 1.[1] He seeks monetary damages. Id. at 3.

    On June 30, 2021, the Court found the complaint stated cognizable claims against Defendants Melissa Stolsig, Jonna Dunlap, Alicia Nix, and SVSP Lt. J. Gomez for deliberate indifference to Plaintiff's serious mental/medical needs in violation of Plaintiff's rights under the Eighth Amendment. Dkt. No. 5 at 3. The Court also found that Plaintiff failed to state a cognizable claim against Defendant SVSP Mental Health Department. Id. The Court gave Plaintiff leave to amend his complaint, or the option of filing a notice to strike the non-cognizable claim in lieu of amending the complaint. Id. at 4.

    On August 18, 2021, Plaintiff filed his notice to strike the non-cognizable claim. Dkt. No. 8. On August 23, 2021, the Court accordingly struck Plaintiff's non-cognizable claim against SVSP Mental Health Department and ordered Defendants to file a motion for summary judgment or other dispositive motion on the cognizable claims. Dkt. No. 9.

---

[1] All page references herein are to the Docket pages shown in the header to each document and brief cited, unless otherwise indicated.

On July 15, 2022, after being granted several extensions of time, Defendants filed a motion for summary judgment on grounds that Plaintiff failed to exhaust administrative remedies. Dkt. No. 34. Defendants requested multiple alternative forms of relief, in the event their motion for summary judgment was denied. First, Defendants asked the Court to conduct a preliminary evidentiary hearing to resolve any disputed questions of fact concerning exhaustion that would otherwise prohibit the Court from granting Defendants' motion. Dkt. No. 34-1 at 6-7. Second, Defendants requested leave to file a second summary judgment motion on the merits in the event this motion for summary judgment is denied. Id. at 7, citing Albino v. Baca, 747 F.3d 1162, 1170 (9th Cir. 2014) (en banc) ("Exhaustion should be decided, if feasible, before reaching the merits of a prisoner's claim."). Finally, Defendants requested they be permitted to submit "further briefing on the issue [of exhaustion]" if this motion is denied. Id.

On March 9, 2023, the Court denied without prejudice Defendants' motion for summary judgment for failure to exhaust administrative remedies. Dkt. No. 39. The Court granted in part Defendants' request for alternative forms of relief, stating as follows:

> As to Defendants' request for alternative forms of relief, if the Defendants wish to further pursue their exhaustion defense as to some or all the Defendants, the Court will allow Defendants some latitude in how they may elect to further pursue their defense. At Defendants' discretion, they may submit: (1) a summary judgment motion on the merits; or (2) a renewed summary judgment motion on the issue of grievance exhaustion as to some or all the Defendants. A renewed motion on exhaustion should address the legal analysis and disputed material factual issues the Court has outlined herein. Lastly, it does not appear that the many and complex disputed factual issues prohibiting entry of summary judgment would be most efficiently resolved through an evidentiary hearing.
>
> If Defendants choose to submit a renewed motion on grievance exhaustion and their motion is denied in whole or in part, they may subsequently submit a summary judgment motion on the merits. If any of the Defendants opt against proceeding with a renewed motion on exhaustion as to the claims against them, those Defendants may elect to proceed directly to a summary judgment motion on the merits. For these reasons and in this manner, Defendants' requests for alternative forms of relief is Granted in Part and Denied in Part.

Id. at 21.

Defendants have since filed a second motion for summary judgment asserting that there is

no evidence from which a factfinder could conclude that any of them violated Plaintiff's Eighth Amendment rights, and that they are entitled to qualified immunity. Dkt. No. 43.[2] Plaintiff filed opposition. Dkt. No. 44. Defendants replied. Dkt. No. 45.

For the reasons discussed below, Defendants' motion for summary judgment is **GRANTED**.

## DISCUSSION[3]

### I. Statement of Facts[4]

**A.  Plaintiff's Version**

The following summary is taken from the Court's March 9, 2023 Order:

> Plaintiff was housed at SVSP when the events underlying his claims took place. Dkt. No. 1 at 1, 2. Plaintiff submitted three written requests for mental health care on March 11, 2020, May 15, 2020, and May 26, 2020.[FN 4] Dkt. No. 1 at 3, Dkt. No. 34-5 at 14. Plaintiff's three requests stated that he had an urgent need for mental health care services because of recent deaths in his family,[FN 5] inability to sleep, and he had resumed hearing voices. Dkt. No. 1 at 3; see Dkt. No. 34-5 at 14. Plaintiff stated that he had been taken off medications "some years ago" but was experiencing re-occurrence of episodes. Dkt. No. 1 at 3.

---

[2] In support of their pending motion, Defendants submit declarations from the following: Defendant Stolsig, Dkt. No. 43-1; Defendant Gomez, Dkt. No. 43-2; Defendant Dunlap, Dkt. No. 43-3; Defendant Nix, Dkt. No. 43-4; non-party Robert Canning, Ph.D., Dkt. No. 43-5; and Deputy Attorney General L. Crenshaw, Dkt. No. 43-6, all with exhibits, Dkt. No. 43-8.

[3] This order contains a few acronym and abbreviations. Here in one place, they are as follows:

| | |
|---|---|
| CCCMS | Correctional Clinical Case Management System |
| CDCR | California Department of Corrections and Rehabilitation |
| 7362 health care request | CDCR 7362 Health Care Request Form |
| CCHCS | California Correctional Health Care Services |
| CIT | Crisis Intervention Team |
| LOP | Local Operating Procedures |
| IDTT | Interdisciplinary Treatment Team |
| MH Need | Mental Health Need |
| SVSP | Salinas Valley State Prison |
| SRASHE | Suicide Risk Assessment and Self-Harm Evaluation |
| UMF | Undisputed Material Facts |

[4] The following facts are not disputed unless otherwise stated.

> [FN 4:] Plaintiff's three requests for mental health care were submitted using the designated form known as Form 7362. Dkt. No. 34-5 at 15, 28.
>
> [FN 5:] Plaintiff's sister and brother had died in a car accident. Dkt. No. 1 at 7.
>
> Plaintiff alleges his three requests for mental health services went unanswered until June 11, 2020, when Plaintiff was seen by Defendant Stolsig, a psychologist. Dkt. No. 1 at 4, 5-7; see also Dkt. No. 19 at 32 (Progress Note of June 11, 2020 visit created by Defendant Stolsig). Plaintiff alleges that Defendant Stolsig failed to adequately address various mental health regulations and considerations including Plaintiff's symptoms and history of suicide attempts and suicidal ideation. Dkt. No. 1 at 5-6.
>
> Plaintiff alleges that on July 3, 2020, he advised an unidentified correctional officer that he was suicidal. Id. at 7. In response, Plaintiff was assessed and interviewed by Defendant Dunlap (a Licensed Clinical Social Worker), Defendant Nix (a Psychiatric Technician), and Defendant Lt. Gomez. Id. at 7; Dkt. No. 34-1 at 1. Defendants Dunlap, Nix, and/or Gomez concluded that Plaintiff was not at imminent risk of suicide. Dkt. No. 1 at 7. Plaintiff was placed back in his cell. Id. at 8. Plaintiff attempted suicide the same day, July 3, 2020, by hanging himself. Id. He was found unconscious and unresponsive. Id.

Dkt. No. 39 at 2-3.

### B. Defendants' Version

In the motion for summary judgment, Defendants' counsel has outlined Defendants' involvement with Plaintiff's mental health care. See Dkt. No. 43 at 8-11. The Court includes Defendants' version below, which summarizes the pertinent facts using their Separate Statement of Undisputed Material Facts ("UMF") in support of their motion for summary judgment and the attached exhibits, which includes Plaintiff's deposition and various declarations from Defendants Stolsig, Gomez, Dunlap, and Nix, non-party California Correctional Health Care Services ("CCHCS") Senior Psychologist (Retired Annuitant[5]) Dr. Robert Canning, as well as from Defendants' attorney, Deputy Attorney General Crenshaw.

---

[5] A "retired annuitant" is a California Public Employees' Retirement System ("CalPERS") retiree who returns to work with a CalPERS employer in a designated retired annuitant position. See https://www.calpers.ca.gov/page/retirees/working-after-retirement/retired-annuitant (last visited Mar. 21, 2024).

First, Defendants describe Plaintiff's initial mental health treatment, and they list his requests for mental health care in early 2020. See id. at 7-8. Defendants discuss Plaintiff's placement in administrative segregation. Id. at 8-9. Defendants then describe Plaintiff's mental health care at issue, including: (1) Plaintiff's actions on July 2, 2020, the day before his suicide attempt; (2) the treatment he received from the Crisis Intervention Team ("CIT") on the morning of July 3, 2020, prior to his suicide attempt that day; (3) his suicide attempt on the night of July 3, 2020; and (4) the treatment he received directly afterwards. Id. at 8-11.

### 1. Initial Mental Health Treatment Upon Entering Custody

Plaintiff entered California Department of Corrections and Rehabilitation ("CDCR") custody in 2011 and began receiving mental health services at the Correctional Clinical Case Management System level.[6] [UMF No. 4.] This included appointments with a psychiatrist every ninety-days, group therapy, and access to other mental-health professionals as needed. [UMF No. 5.] While at the CCCMS level, Plaintiff was prescribed Risperdal. [UMF No. 6.] In 2018, Plaintiff's psychiatrist determined that he no longer required mental health services and Plaintiff's prescription for Risperdal was discontinued. [UMF No. 7.]

### 2. Requests for Mental Health Care in Early 2020

In early 2020, Plaintiff had a death in his family, and he began experiencing sleeplessness and hearing voices. [UMF No. 16.] Plaintiff requested mental health appointments on March 11, 2020, May 15, 2020, and May 26, 2020, but received no response. [UMF No. 17.] Importantly, none of the Defendants were responsible for responding to Plaintiff's requests for mental health appointments, and were not aware of the requests. [UMF No. 18.]

### 3. Plaintiff's Placement in Administrative Segregation

On June 1, 2020, an inmate in Plaintiff's housing unit was murdered. [UMF No. 19.] Plaintiff was a suspect in the murder and was placed in administrative segregation while the murder was being investigated. [UMF No. 20.] Upon arrival in administrative segregation,

---

[6] The CCCMS level is the lowest level of mental health care available to CDCR inmates. See Dkt. No. 43 at 7 fn. 1.

Plaintiff was assessed by a nurse for mental health issues, including suicidal ideation or intent. [UMF No. 21.] During this evaluation, Plaintiff denied any suicidal ideation and was not expressing any bizarre behaviors. [UMF No. 22.] On June 2, 2020, Plaintiff was evaluated by Dr. Barbosa, a psychologist. [UMF No. 23.] During this evaluation, Plaintiff expressed a desire to resume mental health services, but denied any suicidal ideation or intent. [UMF No. 24.] On June 4, 2020, Plaintiff was evaluated by social worker T. Leffler during his appearance before the Institutional Classification Committee. [UMF No. 25.] Plaintiff again denied any suicidal ideation and did not express any bizarre behaviors. [UMF No. 26.] Between June 1, 2020 and June 10, 2020, Plaintiff did not express to any mental health professional that he was suicidal. [UMF No. 27.] While housed in administrative segregation, Plaintiff was checked on daily by a psychiatric technician and every half-hour by custody staff. [UMF No. 28.]

### 4. Plaintiff's Appointment With Dr. Stolsig

On June 11, 2020, Plaintiff had his first and only appointment with Dr. Stolsig. [UMF No. 29.] Dr. Stolsig noted Plaintiff's history of depression, and also noted that Plaintiff was dressed appropriately, hygienic, and was open and pleasant with her. [UMF No. 30.] As part of this appointment, Dr. Stolsig consulted with the psychiatric technician and administrative segregation housing officers regarding Plaintiff's behavior, both of whom had no concerns. [UMF No. 31.] Dr. Stolsig interviewed Plaintiff who stated he was hearing voices and having trouble sleeping. [UMF No. 32.] Dr. Stolsig did not see any evidence of auditory or visual hallucinations and Plaintiff denied any suicidal ideation or intent to harm himself. [UMF No. 33.] Plaintiff indicated he wanted to be placed back into the mental health program and receive medication. [UMF No. 34.] Based on Dr. Stolsig's interview with Plaintiff, discussion with administrative segregation staff, and her own education, skills, and training, Dr. Stolsig concluded the best course of action was to refer Plaintiff to a psychiatrist and initiate the process to have Plaintiff evaluated by the Interdisciplinary Treatment Team ("IDTT") for entry into the mental health program, where he could receive prescription medication. [UMF No. 35.]

### 5. The CIT

On July 2, 2020, Plaintiff learned he was no longer a murder suspect and was being sent back to B-yard, where the murder occurred. [UMF No. 36.] Plaintiff was fearful of going back to B-yard because he worried other inmates would harm him for being associated with the murder. [UMF No. 37.] That same day, Plaintiff again spoke with social worker T. Leffler regarding his concerns about going back to B-yard, but did not express any safety concerns. [UMF No. 38.] Plaintiff also told his counselor that he did not want to go to B-yard, but again did not express any safety concerns. [UMF No. 39.]

On July 3, 2020, at approximately 9:30 a.m., Plaintiff asked the psychiatric technician on duty to speak to social worker T. Leffler, however Plaintiff does not recall this interaction. [UMF No. 40.] Several hours later, at approximately 3:00 p.m., Plaintiff informed administrative segregation staff that he was suicidal. [UMF No. 41.] Plaintiff admits that, at the time he said he was suicidal, he did not have a plan to commit suicide and was just trying to get help. [UMF No. 42.] Approximately one hour later, administrative segregation staff removed Plaintiff from his cell and placed him in a holding cell in his boxers and t-shirt, with one-on-one observation. [UMF No. 43.] Plaintiff spoke with psychiatric technician N. Gooden and indicated he was suicidal and "did not trust himself." [UMF No. 44.] Based on Plaintiff's indication he was suicidal and pursuant to prison policy, Lt. Gomez activated the CIT. [UMF No. 45.]

The CIT is "an interdisciplinary team made up of a mental health clinician, nursing staff . . . and custody supervisory staff, in consultation with the psychiatrist, that provides responsive crisis intervention strategies directed toward resolving patient crises." [UMF No. 46.] The CIT that day consisted of Defendants Dunlap, Nix, and Gomez. [UMF No. 47.] Before meeting with Plaintiff, the CIT reviewed Plaintiff's mental health records going back to 2014. [UMF No. 48.] At approximately 5:30 p.m., Plaintiff was brought into a private room and interviewed. [UMF No. 49.] Plaintiff stated there was a death in his family, that he was experiencing sleeplessness and hearing voices, and that he had requested a mental health appointment earlier in the year but had not received one. [UMF No. 50.] Plaintiff did not mention

his fears about leaving administrative segregation and returning to B-yard and there were no custody concerns noted in his prison file. [UMF No. 51.] Plaintiff stated he was suicidal[7] and that his main concern was to be placed back into the mental health program and obtain prescription medication. [UMF No. 52.] The CIT noted Plaintiff had an appointment the following week with the IDTT, which had the authority to place him back into the mental health program and prescribe medication. [UMF Nos. 53, 54.] Plaintiff was aware of this appointment. [UMF No. 55.]

As part of Plaintiff's evaluation, the CIT assessed thirty-three risk factors and found that six applied to Plaintiff. [UMF No. 56.] The CIT also assessed twelve protective factors and found that nine applied to Plaintiff. [UMF No. 57.] The CIT also noted Plaintiff was dressed appropriately, made good eye contact, was calm with coherent speech, had normal motor function, demonstrated reality based thoughts and linear thinking, exhibited no observational evidence of auditory or visual hallucinations, and was cooperative. [UMF No. 58.] Further, there were no indicators or warning signs of imminent suicide. [UMF No. 59.] Based on their evaluation, the CIT concluded that Plaintiff had a high chronic risk of suicide, but low acute risk of suicide. [UMF No. 60.] The CIT decided to return Plaintiff back to his assigned housing in administrative segregation, where he would be checked on hourly by a psychiatric technician. [UMF No. 61.] Plaintiff was returned to his cell in administrative segregation the same evening. [UMF No. 62.]

**6.    Plaintiff's July 3, 2020 Suicide Attempt**

At approximately 10:15 p.m. on July 3, 2020, Plaintiff was discovered in his cell lying on the floor with a noose made from a short sheet around his neck. [UMF No. 63.] Plaintiff has no recollection of these events. [UMF No. 64.] When Plaintiff was found, the sheet was not attached to anything and Plaintiff was responsive. [UMF No. 65.] Staff escorted Plaintiff to medical staff, where a ligature mark was found on his neck. [UMF No. 66.] Pursuant to policy, Plaintiff was sent to an outside hospital, where he was assessed, provided no treatment, and discharged shortly

---

[7] Defendants claim that Defendants Dunlap, Nix, and Gomez deny Plaintiff told them he was suicidal during their interview with him on July 3, 2020. Dkt. 43 at 10 fn. 2. However, Defendants state that "for the purposes of this motion, they will accept Plaintiff's testimony that he did indicate he was suicidal as an undisputed fact." Id.

8

thereafter. [UMF No. 67.] Upon his return, Plaintiff was placed in a Mental Health Crisis Bed. [UMF No. 68.] After Plaintiff's suicide attempt, Plaintiff was evaluated by the IDTT, was placed back into the mental health program, and was prescribed medication. [UMF No. 69.] Plaintiff is still part of the mental health program. [UMF No. 70.] He has had no further interactions with any of the Defendants. [UMF No. 71].

### 7. Expert Testimony by Dr. Canning

The Court notes that Defendants have supported their motion for summary judgment with expert testimony. See Canning Decl. (Dkt. No. 43-5). Specifically, Defendants present a declaration from a medical expert, CCHCS Senior Psychologist Dr. Canning, who obtained a Ph.D. in Clinical Psychology from Palo Alto University, has been licensed by the State of California Board of Psychology since 1977, has been a Certified Correctional Healthcare Professional since 2016, and has held his position as CCHCS Senior Psychologist since 2020. Id. ¶¶ 2-4.

Dr. Canning describes the duties of a Senior Psychologist as follows:

> My duties include review and editing of quality improvement documents, interaction with senior Mental Health staff at CCHCS headquarters, and participation in a Federal court-ordered process of data validation in the *Coleman v*[.] *Newsom* litigation. Prior to this, I served as a Senior Psychologist and Suicide Prevention Coordinator from 2005 to 2015 and Senior Psychologist with the Mental Health Quality Management program from 2015-2018. My duties in this position included chairing the CDCR's statewide suicide prevention committee, preparation and delivery of suicide risk assessment trainings for clinicians in the CDCR, participation in preparation and implementation of multiple policies and procedures regarding suicide prevention in California's prisons. As part of the Quality Management program my duties included design and implementation of the department's electronic health record system and participation in the court-ordered quality improvement program for mental health.

Id. ¶ 4. Dr. Canning claims to be "familiar with the standard of care and skill ordinarily exercised by reputable members of the psychology professions providing mental health care in prison . . . [and] also familiar with the practices, policies, and procedures promulgated by the [CDCR] and CCHCS regarding delivery of mental health care to inmates in CDCR prisons." Id. at 5.

Dr. Canning was "asked by the Office of the Attorney General to review the medical and mental health records of [Plaintiff], CDCR number AG3258, and to provide my expert psychological opinions as to the claims that Dr. Stolsig, J. Gomez, J. Dunlap, and A. Nix failed to provide adequate and timely care to Plaintiff, resulting in Plaintiff's attempted suicide." Id. ¶ 7. Dr. Canning states that Plaintiff's medical records, including mental health records, documenting care provided to him while incarcerated in California prisons are "produced and stored in an electronic system called EHRS (Electronic Health Record System)," which was formerly called the UHR (unified health record) before late 2016. Id. ¶ 6. Dr. Canning explains that his professional psychological opinion is

> based on [his] review of Plaintiff's Complaint, the Court's Screening Order dated August 23, 2021, [his] knowledge of CCHCS and CDCR policies and procedures, [his] analysis of Plaintiff's ERMS/SOMS[8], [his] review of the Incident Report related to Plaintiff's attempted suicide, [his] review of Plaintiff's deposition transcript, and [his] analysis of the medical and mental health records kept by CCHCS documenting medical and mental health care provided to Plaintiff . . . [which] are available to [him] in [his] position with CCHCS.

Id. ¶ 8. Lastly, Dr. Canning states that he "focus[ed] particular attention on the documents regarding the events and claims at issue in this matter," and he certifies that the documents attached to his declaration are true and correct copies of original documents from Plaintiff's health record. Id., Dkt. No. 43-9 (Exs. B-G) at AG0131-AG0192.

Dr. Canning's declaration provides the only expert evidence about Plaintiff's treatment, but prior to revealing his opinion, Dr. Canning described the CDCR's local operating procedures ("LOPs"), including the suicide prevention protocol and the Crisis Intervention Team ("CIT"), which the Court outlines below.

        **a.    Suicide Prevention Protocol and Deployment of the CIT**

The CDCR has a suicide prevention protocol, which dictates that if an inmate reports an emergent mental health ("MH") need to prison staff, or staff observe an inmate they believe to

---

[8] ERMS/SOMS stands for Electronic Records Management System/Strategic Offender Management System/SOMS, and it makes up Plaintiff's prison file, but do not include medical or mental health records. See Canning Decl. ¶ 8 fn. 1.

require an emergent MH referral intervention then staff shall immediately notify a member of the health care staff.  Dkt. No. 43-9 ("LOP #402 – CIT") at AG0154.  LOP #402 - CIT "details a special response team designated to provide assessment and specialized intervention for inmate-patients . . . who state and/or are in a mental health crisis at SVSP (e.g. stating he/she is suicidal)." Id. at AG0153.  "An inmate **does not need to state they are suicidal to deploy the CIT**.  If an inmate makes any statements of self-harm or displays self-injurious behavior, staff shall follow the protocol outlined in LOP #400 Suicide Prevention." Id. at AG0154 (emphasis in original).

According to Dr. Canning, "[w]hen evaluating an inmate in crisis, the CIT is required to interview the inmate and complete the Suicide Risk Assessment and Self-Harm Evaluation ('SRASHE').[9]"  Canning Decl. ¶ 23 (footnote added).  He further describes the SRASHE as follows:

> The SRASHE is composed of a standardized measure of suicide risk assessment, the Columbia-Suicide Severity Rating Scale[10], a review of the inmate's history of self-harm, and an interview regarding risk and protective factors.  The SRASHE is used to evaluate an inmate's risk of suicide and is administered whenever an inmate expresses suicidal ideation, makes threats, or makes a suicide attempt.

Id. (footnote added).

### b.  Dr. Canning's Expert Opinion

As to the July 3, 2020 incident, prior to which Plaintiff told a psychiatric technician that he was suicidal, Dr. Canning claims that "[c]ustody and nursing staff were notified of Plaintiff's claims that he was suicidal and the [CIT] was activated . . . [which] consisted of Lt.. J. Gomez, Senior Psychiatric Technician A. Nix, and Licensed Clinical Social Worker J. Dunlap, all defendants in this matter."  Canning Decl. ¶22.

Based on his professional opinion and on his review of Plaintiff's medical and mental health records as well as his training and experience, Dr. Canning determined that it was his

---

[9] Dr. Canning claims to have "helped to develop the first iterations of this assessment during [his] time at CDCR."  Canning Decl. ¶ 23 fn. 3.

[10] The Columbia-Suicide Severity Rating Scale is a suicidal ideation and behavior rating scale created to evaluate suicide risk.  Canning Decl. ¶ 23 fn. 4.

11

professional opinion that "Plaintiff was provided timely, adequate and appropriate mental health care, and the course of treatment was medically acceptable and within the applicable standard of care by other psychologists and psychiatrists in the United States and the State of California." Id. ¶ 30. In addition, Dr. Canning states that "had [he] been a member of the CIT evaluating Plaintiff on July 3, 2002, [he] would also have made the decision to return Plaintiff to his housing unit, as opposed to sending him to a higher level of care." Id. ¶ 28. Specifically, Dr. Canning opined as follows: (1) Plaintiff's allegations that Dr. Stolsig delayed providing him with mental care are without merit; (2) Plaintiff's allegations that the CIT members delayed providing him with mental health care leading to his suicide are also without merit; and (3) none of the Defendants contributed to any delay or lack of response to Plaintiff's 7362 health care requests submitted in March and May 2020. Id. at ¶¶ 26-27, 29. The Court elaborates on Dr. Cannings three aforementioned points below.

### i.  Dr. Stolsig

Dr. Canning further explains his opinion that that Plaintiff's allegations that Dr. Stolsig delayed providing him with mental care are without merit, stating as follows:

> Dr. Stolsig saw Plaintiff on one occasion, interviewed him, and spoke with staff who interacted with Plaintiff regularly to determine if they noted any concerns. Further, at the time Dr. Stolsig saw Plaintiff, he was not exhibiting psychosis and did not appear to be in distress, despite reporting symptoms of sleeplessness and hearing voices. Importantly, Plaintiff denied suicidal ideation or intent to harm himself, and had not claimed he was suicidal in any prior mental health request or evaluation. Dr. Stolsig's decision to refer Plaintiff to the IDTT was appropriate and reasonable as his presentation and primary symptoms did not lead to the conclusion that he required a higher level of care. Once Dr. Stolsig referred Plaintiff to the IDTT, she would not be responsible for any further scheduling responsibilities to ensure Plaintiff was in fact seen by the IDTT. It is my opinion that Dr. Stolsig's treatment of Plaintiff met the applicable standard of care for psychologists in the United States and the State of California.

Id. ¶ 26.

### ii.  CIT Members

Dr. Canning also found no merit as to Plaintiff's allegations that the CIT members delayed

providing him with mental health care leading to his suicide, and elaborated on this as follows:

> The CIT was appropriately staffed by Defendants J. Gomez, A. Nix, and J. Dunlap. The CIT reviewed Plaintiff's mental health history, interviewed him, and performed the SRASHE. Plaintiff indicated that his primary goal was to get back into the mental health program and obtain prescription medication. His presentation did not reveal psychosis or bizarre behaviors, and he did not identify any plans for self-harm. Finally, Plaintiff had limited risk factors and multiple protective factors that applied to him, leading to a reduced acute suicide risk. Based on this, it was medically appropriate and reasonable to return Plaintiff to his housing unit as his presentation did not show serious suicidal intention and did not indicate he required a higher level of care.

Id. ¶ 27.

### iii. March/May 2020 7362 Health Care Requests

Dr. Canning opined that none of the Defendants contributed to any delay or lack of response to Plaintiff's 7362 health care requests submitted in March and May 2020, upon finding as follows:

> None of the Defendants were responsible for collecting health care request forms, processing them, or scheduling appointments as part of their job duties, nor did they have any ability to respond to any of those health-care requests until the requests were referred directly to them.

Id. ¶ 29.

## II. Summary Judgment

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Generally, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. See Celotex Corp., 477 U.S. at 323. Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. But on an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." Id. at 325. If the evidence in opposition to the motion is merely colorable, or is not significantly probative, summary judgment may be granted. See Liberty Lobby, 477 U.S. at 249-50.

The burden then shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial.'" Celotex Corp., 477 U.S. at 324 (citations omitted). If the nonmoving party fails to make this showing, "the moving party is entitled to a judgment as a matter of law." Id. at 323.

The Court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a material fact. See T.W. Elec. Serv., Inc. V. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. See id. at 631. It is not the task of the district court to scour the record in search of a genuine issue of triable fact. Keenan v. Allen, 91 F.3d 1275, 1279 (9th Cir. 1996). The nonmoving party has the burden of identifying with reasonable particularity the evidence that precludes summary judgment. Id. If the nonmoving party fails to do so, the district court may properly grant summary judgment in favor of the moving party. See id.; see, e.g., Carmen v. S.F Unified School Dist., 237 F.3d 1026, 1028-29 (9th Cir. 2001).

### A.     Deliberate Indifference

The treatment a prisoner receives in prison and the conditions under which he is confined

are subject to scrutiny under the Eighth Amendment. See Helling v. McKinney, 509 U.S. 25, 31 (1993). A mentally ill prisoner may establish unconstitutional treatment by prison officials by showing that officials have been deliberately indifferent to his serious medical needs. See Doty v. County of Lassen, 37 F.3d 540, 546 (9th Cir. 1994). A serious mental/medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Doty, 37 F.3d at 546; see, e.g., Conn v. City of Reno, 591 F.3d 1081, 1094 (9th Cir. 2010) (a heightened suicide risk or an attempted suicide is a serious medical need; reversing grant of summary judgment to transporting police officers where plaintiffs presented sufficient evidence for a jury to find that the decedent's pre-suicidal actions objectively evidenced a serious medical need), vacated by 563 U.S. 915 (2011), reinstated in relevant part as modified by 658 F.3d 897 (9th Cir. 2011); Capps v. Atiyeh, 559 F. Supp. 894, 916 (D. Ore. 1983) (inmate suffers Eighth Amendment pain whenever he must endure untreated serious mental illness for any appreciable length of time).

Furthermore, under the Eighth Amendment, deliberate indifference requires a showing that prison officials possess a sufficiently culpable state of mind. See Farmer v. Brennan, 511 U.S. 825, 834 (1994). Specifically, it must be shown both that officials were subjectively aware of the serious medical need and failed to adequately respond to that need. Conn, 591 F.3d at 1096. Additionally, the officials' actions must be the cause of the injury suffered as a result of their deliberate indifference. Id. at 1098. For example, in Conn, the Ninth Circuit reversed the district court's grant of summary judgment to transporting police officers where the plaintiffs (the children of a pre-trial detainee who committed suicide), presented sufficient evidence for a jury to conclude that transporting police officers (a) must have been subjectively aware that the decedent was at an acute risk of harm (suicide) and suffered a serious medical need; (b) failed to respond properly to such risk by informing jail officials; and (c) such failure was both the actual and proximate cause of the decedent's suicide once at the jail. See id. at 1097-1102.

To satisfy the subjective element, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts

from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837. A plaintiff must establish that the course of treatment the doctors chose was "medically unacceptable under the circumstances" and that they embarked on this course in "conscious disregard of an excessive risk to [the plaintiff's] health." See Toguchi v. Chung, 391 F.3d 1051, 1058-60 (9th Cir. 2004) (citing Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996), overruled in part on other grounds by Peralta v. Dillard, 744 F.3d 1076 (9th Cir. 2014) (en banc)). A claim of mere negligence related to medical problems, or a difference of opinion between a prisoner patient and a medical doctor, is not enough to make out a violation of the Eighth Amendment. Id.

### B. Analysis

Here, as mentioned above, Plaintiff alleges that Defendants failed to provide adequate mental health treatment and were deliberately indifferent to his serious mental/medical needs. Dkt. No. 1 at 4-8. First, he alleges his three requests for mental health services sent sometime between March to May 2020 went unanswered until June 11, 2020, when Plaintiff was seen by Defendant Stolsig. Id. at 4, 5-7. Plaintiff further alleges that Defendant Stolsig failed to adequately address various mental health regulations and considerations including Plaintiff's symptoms and history of suicide attempts and suicidal ideation. Id. at 5-6. Finally, Plaintiff claims that on July 3, 2020, after he advised an unidentified correctional officer that he was suicidal, Defendants Dunlap, Nix, and Gomez interviewed him but then concluded that Plaintiff was not at imminent risk of suicide, and he was placed back in his cell. Id. at 7-8. Plaintiff attempted suicide that same day, July 3, 2020, by hanging himself, and he was found unconscious and unresponsive. Id. at 8.

Meanwhile, Defendants assert that Plaintiff cannot prove that they violated his Eighth Amendment rights because does not allege in his complaint that he was at an imminent risk of committing suicide at the time of his July 3, 2020 evaluation, but at most, only showed "some risk factors," which were outweighed by his denial of any plans or intent to harm himself and his goal of re-entering the mental health program. See Dkt. 43 at 15-16. In his opposition, Plaintiff argues

in a conclusory fashion that "an additional (10) risk factors should have been assessed for the decision making which would have put Plaintiff[']s risk for suicide much higher." Dkt. No. 44 at 6. However, without more support (for example, by providing an expert opinion confirming such a claim), his argument is insufficient to satisfy the objective prong for a deliberate indifference claim. Id. at 3-4. Whereas Defendants have provided expert evidence from Dr. Canning that Defendants' actions were medically appropriate. See Canning Decl. ¶ 27.

Furthermore, Defendants assert even if there was an objective risk of suicide, Plaintiff cannot show that either Defendant Stolsig or the other Defendants on the CIT knew of this risk and "deliberately ignored" it. See Dkt. No. 43 at 17-18, 19-20. In addition, Defendants argue that there is no evidence that they acted with deliberate indifference to his serious mental/medical needs by failing to provide him with adequate mental health treatment, resulting in his suicide attempt. Id. at 7. Defendants assert that "the undisputed facts show that [they] timely evaluated Plaintiff and made appropriate medical decisions given Plaintiff's presentation at the time of their evaluation." Id.

After a careful review of the evidence, the Court finds there are no genuine issues of material fact as to whether Defendants acted with deliberate indifference to Plaintiff's serious mental/medical needs. Assuming that there was an objectively serious risk of Plaintiff committing suicide, he fails to satisfy the second prong, i.e., that Defendants were subjectively, deliberately indifferent to his medical/mental needs because they failed to take reasonable steps to abate a substantial risk of serious harm. See Farmer, 511 U.S. at 834, 837. It is not likely that a reasonable jury would find that Defendants were subjectively aware that Plaintiff faced a substantial risk of harm and disregarded it. Based on Plaintiff's presentation, Defendants on the CIT assessed Plaintiff's acute suicide risk as low, and with the knowledge that he was to be seen that following week by the IDTT (which had the authority to place him back into the mental health program and prescribe medication), they made a decision based on their training and experience to send him back to his housing unit. Plaintiff has presented no evidence that Defendants Dunlap, Nix, and Gomez were anything but responsive and thorough. While Plaintiff disagrees with these

Defendants' evaluation and decision to send him back to his housing unit, this amounts only to a difference of opinion concerning the appropriate course of treatment, which does not amount to deliberate indifference. See Toguchi, 391 F.3d at 1058; Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989); see also Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981) ("[A] difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a [§] 1983 claim.").

Lastly, it is undisputed that during Defendant Stolsig's evaluation of Plaintiff on June 11, 2020, she was unaware, that Plaintiff was expressing suicidal ideation. [UMF No. 33.] Plaintiff does not deny this in his opposition. See Dkt. No. 44. Nor does Plaintiff claim that Defendant Stolsig's decision to refer him to the IDTT was medically unacceptable or that it ignored an imminent suicide risk. Id. Finally, Plaintiff did not attempt suicide directly after he was evaluated by Dr. Stolsig, and Plaintiff does not claim any harm as a result of her evaluation of him on June 11, 2020. Plaintiff has filed to provide evidence that Defendant Stolsig was subjectively aware of Plaintiff's serious mental/medical needs.

To the extent that Plaintiff's claim amounts to medical malpractice or an allegation that Defendants were negligent in providing treatment, his allegations do not support an Eighth Amendment claim. See Franklin v. State of Or., State Welfare Div., 662 F.2d 1337, 1344 (9th Cir. 1981); Toguchi, 391 F.3d at 1060; McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992) (mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc)); O'Loughlin v. Doe, 920 F.2d 614, 617 (9th Cir. 1990) (repeatedly failing to satisfy requests for aspirins and antacids to alleviate headaches, nausea, and pains is not constitutional violation; isolated occurrences of neglect may constitute grounds for medical malpractice but do not rise to level of unnecessary and wanton infliction of pain). Despite Plaintiff's claim that Defendants failed to provide adequate mental health treatment, Defendants have submitted a verified declaration from their medical expert, Dr. Canning, indicating that Plaintiff was provided "timely, adequate and appropriate mental health care, and the course of

treatment was medically acceptable and within the applicable standard of care by other psychologists and psychiatrists in the United States and the State of California." Canning Decl. ¶ 30.

Based on the evidence presented, Defendants have demonstrated the absence of a genuine issue of material fact with respect to Plaintiff's Eighth Amendment claim against them. See Celotex Corp., 477 U.S. at 323. Because no reasonable fact finder could conclude that Defendants acted with deliberate indifference, Defendants are entitled to judgment on the claim against them. See Celotex Corp., 477 U.S. at 323.

## CONCLUSION

For the reasons stated above, Defendants Dunlap, Nix, Gomez, and Stolsig's motion for summary judgment is **GRANTED**.[11] Dkt. No. 43. The Eighth Amendment deliberate indifference claim against them is **DISMISSED** with prejudice.

This order terminates Docket No. 43.

**IT IS SO ORDERED.**

**Dated:** March 26, 2024

EDWARD J. DAVILA
United States District Judge

---

[11] Because the Court finds no constitutional violation occurred, it is not necessary to reach Defendants' qualified immunity argument.